**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

ESSEX INSURANCE COMPANY,
et al.,

                Plaintiffs,

-vs-                                       Case No. 3:12-cv-219-J-JRK

BARRETT MOVING & STORAGE, INC.,
et al.,

                Defendants.
_____/

## O R D E R[1]

### I.  Status

Plaintiffs initiated this action on February 29, 2012 pursuant to the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706.  See Complaint (Doc. No. 1) at 1-7 ("Compl.").  In sum, this case involves the transportation of a Magnetic Resonance Imaging machine ("MRI") and related equipment, including a magnet; the magnet was allegedly damaged during transport; and Plaintiffs now seek to recover damages.  See generally id.

The following is a brief description of the parties involved in this action.  Plaintiff Nationwide Imaging Services, Inc. ("Nationwide") owned the MRI and scheduled the transportation of the MRI with Defendant Barrett Moving & Storage Inc. ("Barrett").  Barrett engaged Defendant Landstar ("Landstar") to transport the shipment along with Barrett, and

---

[1]    The parties consented to the exercise of jurisdiction by a United States Magistrate Judge.  See Notice, Consent, and Reference of a Civil Action to a Magistrate Judge (Doc. No. 48), filed June 14, 2013; Reference Order (Doc. No. 49), entered June 20, 2013.

the part of the shipment transported by Landstar (the magnet) was allegedly damaged during transport.  Nationwide had an insurance policy through Plaintiff Essex Insurance Company ("Essex").  After paying Nationwide under the policy, Essex became subrogated to proceed against the party or parties responsible for part of the alleged damages.[2]

Currently pending before the Court are the parties' cross-motions for summary judgment; the responses in opposition thereto; and as to two of the motions, the reply briefs in support of the motions:

1.     Defendant Landstar Transportation Logistics, Inc.'s Motion for Partial Summary Judgment to Limit Liability (Doc. No. 22; "Landstar's Motion"), filed March 1, 2013; Plaintiffs' Response in Opposition to Landstar's Motion for Summary Judgment [DE 22] (Doc. No. 33; "Plaintiffs' Response to Landstar's Motion"), filed March 25, 2013.

2.     Defendant Barrett Moving & Storage, Inc.'s, Motion for Summary Judgment (Doc. No. 23; "Barrett's Motion"), filed March 1, 2013; Plaintiffs' Response in Opposition to Barrett Moving & Storage, Inc.'s Motion for Summary Judgment [DE 23] (Doc. No. 34; "Plaintiffs' Response to Barrett's Motion"), filed March 25, 2013; Defendant Barrett's Reply Brief in Support of its Motion for Summary Judgment (Doc. No. 40; "Barrett's Reply"), filed April 17, 2013.

---

[2]     Pursuant to the insurance policy that Nationwide had with Essex, Essex paid Nationwide "the maximum amount of coverage provided by said policy, to wit, $346,500, and by reason thereof becoming subrogated thereafter to proceed against the parties responsible for this loss."  Compl. at 4 ¶ 24 (citing Subrogation Receipt (Doc. No. 1), at 15.  The uninsured portion of the loss that Nationwide seeks to recover equals $213,500.  Compl. at 4 ¶ 25.  In total, Plaintiffs seek entry of judgment of at least $560,000 together with prejudgment and post-judgment interest and costs. Id. at 7.  Plaintiffs request the judgment be entered against Defendants jointly and severally.  Id. at 6 ¶ 42.

3.    Plaintiffs' Motion for Summary Judgment (Doc. No. 27; "Plaintiffs' Motion"), filed March 1, 2013; Defendant Barrett Moving & Storage, Inc.'s Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment (Doc. No. 32; "Barrett's Response"), filed March 25, 2013; Plaintiffs' Reply in Further Support of Summary Judgment (Doc. No. 41; "Plaintiffs' Reply"), filed April 17, 2013.

In addition, multiple documents were filed in support of each Motion.  See Plaintiffs' Notice of Filing Request for Admissions to Barrett Moving & Storage, Inc. and Response to Request for Admissions by Barrett Moving & Storage, Inc. (Doc. No. 20), filed March 1, 2013; Plaintiffs' Notice of Filing Deposition Transcript of Robert Manetta (2 Parts) (Doc. No. 21), filed March 1, 2013; Defendants' Notice of Filing Discovery and Evidentiary Materials in Support of their Respective Motions for Summary Judgment (Doc. No. 24), filed March 1, 2013; Plaintiffs' Notice of Filing Affidavits in Support of Motion for Summary Judgment (Doc. No. 26), filed March 1, 2013; Plaintiffs' Notice of Filing Depositions in Support of Motion for Summary Judgment (Doc. No. 30), filed March 22, 2013; Plaintiffs' Notice of Re-Filing Depositions and Affidavit of Mark DePew and Exhibits in Support of Motion for Summary Judgment [DE 27] and In Opposition to Motions for Summary Judgment [DE 22] and [DE 23] (Doc. No. 31), filed March 25, 2013; Plaintiffs' Notice of Re-Filing Deposition of Randall Koepsell in Support of Motion for Summary Judgment [DE 27] and in Opposition to Motions for Summary Judgment [DE 22] and [DE 23] (Doc. No. 35), filed March 26, 2013.

The Court held oral argument on August 20, 2013 and heard from counsel of record for all parties.  See Minute Entry (Doc. No. 57).  These matters are ripe for resolution.

## II.  Facts

### A.  Scheduling the Transport

Generally, representatives of Nationwide (Marc Regan and Ann Marie McGuigan) and representatives of Barrett (Stacey Jacobson and Brigitt Berlin) exchanged several emails and apparently some telephone calls regarding scheduling the transportation of the MRI and related equipment from Illinois to Texas.  See Doc. No. 31-3 at 1-18 (chain of emails attached to Ms. Jacobson's deposition); see also Doc. No. 31-2 at 5, 12[3] (Ms. Jacobson stating in her deposition that she works for Barrett and Ms. McGuigan works for Nationwide).  The following is a detailed summary of the pertinent portions of those emails.

On November 22, 2010, Ms. McGuigan (Nationwide) contacted via email Ms. Jacobson (Barrett) seeking a quote to transport an Avanto MRI machine from Illinois to Texas.  See Doc. No. 31-3 at 17-18.  Ms. McGuigan (Nationwide) advised that Nationwide would "[n]eed [a] flatbed for [the] magnet and [a] closed truck for [the] electronics . . . but they need to be delivered at [the] same time."  Id. at 17.  The MRI machine and related equipment were to be picked up from Parkside MRI in Park Ridge, Illinois and delivered to Prime Imaging Partners in Dallas, Texas.  See id. at 8.  On that same date, Ms. Jacobson (Barrett) responded: "In order to ensure that the components are delivered at the same time as the flatbed you would have to book a full truck.  Flatbed: $2236[;] Enclosed truck for components: $3860."  Id. at 16 (formatting omitted).  Several additional emails were exchanged, and then on December 1, 2010, the transport was placed on hold for a time.  Id. at 11.

---

[3]      When citing to deposition transcripts, the undersigned cites to the page numbers assigned to the deposition transcript by the court reporter who transcribed it.

On December 10, 2010, the scheduling process resumed, id. at 10, and based upon Nationwide's requests of days/times for pick-up and delivery (that changed from the original request), Ms. Jacobson (Barrett) asked Nationwide if she should "see if [she] ha[d] a team available for the flatbed and what the cost [would be]?" Id. at 4; see id. at 7-10. Apparently, there was a telephone conversation between Nationwide and Barrett representatives, see id. at 4, and then Ms. Jacobson (Barrett) advised via email that "[t]he cost for a team of drivers is $3375 & is based on availability. If you [(Nationwide)] are okay with the price please let me know a.s.a.p. and I will have my logistics dept begin to search for an available team." Id. In a separate email, Nationwide confirmed it was ready to proceed with the transport, and Ms. Jacobson (Barrett) responded via email, "I have notified my logistics to begin searching [for] a flatbed team." Id. at 3. Ms. Jacobson (Barrett) responded in a separate email and provided the names of three drivers: two for the flatbed truck and one for the enclosed truck. Id. at 1. The driver for the enclosed truck was specifically referred to as a Barrett driver in a prior email. See id. at 6 (Ms. Jacobson (Barrett) advising Ms. McGuigan (Nationwide) that "Barrett driver Jerry Armson" will be driving the enclosed truck). Ms. Jacobson (Barrett) also provided information for an "emergency contact [person] at Barrett," because the transportation was scheduled to occur over a weekend. Id. at 1; see Doc. No. 26-4 at 5-6 (duplicate of email showing the complete to/from heading).

B.  The Transport

Present at the pick-up and delivery locations were two people pertinent to the instant dispute: Mark Depew and Larry Knight. Mr. Depew is "a partner at Altima Diagnostic Imaging Solutions in Plano[,] Texas." Doc. No. 31-4 at 1 ¶ 1. Mr. Depew was hired by Nationwide as

"an independent engineer . . . to ensure the safe arrival of the MRI, . . . [and] to supervise the loading[,] packing[,] and unloading of the equipment."  Doc. No. 26-3 at 4 ¶ 13 (affidavit of Robert Manetta, Senior Vice President of Nationwide); see also Doc. No. 21-1 at 39-41 (deposition of Mr. Manetta).  Mr. Knight is an "Operations Partner for Altima Diagnostic Imaging Solutions in Plano[,] Texas."  Doc. No. 26-2 at 1 ¶ 1.

According to Mr. Depew and Mr. Knight, they both inspected the MRI prior to transport. Doc. No. 26-2 at 1 ¶ 3; Doc. No. 31-4 at 1 ¶ 2.  Mr. Knight indicates that the MRI was "in excellent condition" prior to transport.  Doc. No. 26-2 at 1 ¶ 3.  In Illinois at the pick-up location, Mr. Depew and Mr. Knight observed the entire process from de-installing the MRI to placing the MRI on the flatbed truck.  Doc. No. 26-2 at 1-2 ¶ 3; Doc. No. 31-4 at 1-2 ¶ 2. Mr. Depew states that he did not witness any "incident or accident or event that took place during loading which would or could have caused damage to the MRI."  Doc. No. 31-4 at 1-2 ¶ 3.  Similarly, Mr. Knight indicates that the MRI "was professionally de-installed and . . . safely loaded onto the flatbed and properly prepared for transport."  Doc. No. 26-2 at 1-2 ¶ 3.

All three drivers timely arrived at the pick-up location.  At the pick-up location, the team of drivers for the flatbed truck, who worked for Landstar rather than Barrett, provided a "Uniform Straight Bill of Lading" to Mr. Depew and Mr. Depew signed that Bill of Lading.[4]  See Doc. No. 31-4 at 2 ¶ 6 (Mr. Depew's affidavit stating that he "signed the [B]ill of [L]ading when the unit was picked up . . . [and] when it was off loaded at Dallas"); see also Doc. No. 24-2 at

_____

[4]        The import of the Bill of Lading is heavily disputed.

34 (a copy of the Bill of Lading).[5]  The MRI and related equipment were transported on two trucks, with Landstar's flatbed truck carrying the magnet.

Mr. Depew states that at the point of delivery, "after the tarp like covering was removed," he noticed there was "ice buildup on the magnet" (the magnet was transported on Landstar's flatbed truck).  Doc. No. 31-4 at 2 ¶ 4.  He further states that "[t]he drivers of the delivery truck along with numerous other people were present and saw the same things and w[ere] immediately made aware of our concerns."  Id. at 2 ¶ 5.  According to Mr. Depew, "the extent of the damage . . . was only determined by Oxford after testing took place."  Id. at 2 ¶ 6.

Likewise, Mr. Knight, who was also present at the delivery location, states that he "observed [the MRI's] condition immediately . . . [and] we noticed changes that were readily observable."  Doc. No. 26-2 at 2 ¶ 4.  Mr. Knight indicates that "several days" were spent "testing and attempting to verify the condition of the unit after it arrived in Dallas.  It was only on Monday[,] December 20th, 2010, when power was applied to the magnet . . . that we realized we had to undertake an even more extensive analysis."  Id. at 3 ¶ 13.  According to Mr. Knight, "[a] full inspection of the unit was conducted by qualified experts which revealed that the unit suffered a severe shock during transportation from Chicago to Dallas which resulted in a thermal short to the magnet rendering the unit unusable."  Id. at 3 ¶ 14.

---

[5]     Several copies of the Bill of Lading have been filed in the record.  This copy appears to be the most legible.

### C.  Bill of Lading

The Bill of Lading presented to Mr. Depew at the pick-up location and at destination has Landstar's logo on it and indicates that "Landstar Ranger" is the name of the carrier.  See Doc. No. 24-2 at 34.  With respect to limiting liability, the Bill of Lading provides in pertinent part as follows: "Unless a greater value is specified below: for which an extra charge will apply, the liability of the carrier for damage or loss to the goods shall be released to the lesser of . . . $1.00 per pound/$50,000 per truckload shipment for shipments of used goods, not to exceed the actual loss."  Id. (emphasis omitted).  No value appears to be declared on the Bill of Lading.  See id.  If a problem were to occur during the transportation, the person to be contacted was listed as "Mark D. Depew."  Id.

There is a section entitled "Shipper Certification" on the Bill of Lading.  See id. That certification is as follows: "This is to certify that the above named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the Department of Transportation." Id. There is a signature (apparently it is Mr. Depew's signature) and it is dated "12/17/10." Id. There is also a box entitled "Receiver Certification." Id. That certification reads: "Received the above described property in good condition except as noted" and it is signed by Mark D. Depew and dated "12/18/10" at "12:45 pm." Id. (capitalization omitted from first quotation). The Bill of Lading reflects that no exceptions were noted. See id.

### D.  Reporting the Damage

On or about January 3, 2011 (about sixteen (16) days after the magnet was delivered to Dallas, Texas), Nationwide sent a written letter to Barrett advising that Nationwide "intends

to file claim for damages of the Siemens Avanto Magnet that was damaged during shipment." Doc. No. 26-4 at 27.  In response, on or about January 10, 2011,[6] Barrett drafted a letter "[t]o all concerned parties."[7]  Id. at 25.  In that letter, Barrett recognized it had received from Nationwide a "written statement" of damage relating to the subject shipment.  Id.  Barrett advised that it was "the transportation arranger of this shipment" and it was "providing this notice to confirm identification of all responsible parties to facilitate the claims process."  Id. The parties apparently could not resolve the claims, see Doc. No. 1 at 17-18, because the instant case followed.

### III.  The Carmack Amendment

Generally, the Carmack Amendment governs the potential liability of a carrier[8] to a shipper when the shipper claims loss or damage to shipped property.  See Molloy v. Allied Van Lines, Inc., 267 F. Supp. 2d 1246, 1251 (M.D. Fla. 2003).  The Carmack Amendment does not apply to brokers.[9]  Hewlett-Packard Co. v. Brother's Trucking Enters., 373 F. Supp. 2d 1349, 1351 (S.D. Fla. 2005) (citing 49 U.S.C. § 14706(a)).  "The purpose of the Carmack Amendment is to protect shippers against the negligence of interstate carriers and to 'relieve

---

[6]    Although the letter is dated January 10, 2010, the undersigned assumes this was a scrivener's error and the year was actually 2011.

[7]    Barrett's letter appears to quote "a written statement from [Nationwide that was] made on . . . 1/04/11" that discusses some of the events that transpired with the shipment and the damage to the shipment.  Doc. No. 26-4 at 25.

[8]    "The term 'carrier' means a motor carrier, a water carrier, and a freight forwarder."  49 U.S.C. § 13102(3).   "The term 'motor carrier' means a person providing motor vehicle transportation for compensation."   49 U.S.C. § 13102(14).

[9]    "The term 'broker' means a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation."  49 U.S.C. § 13102(2).

shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods.'" Fuente Cigar, Ltd. v. Roadway Express, Inc., 961 F.2d 1558, 1559 n.1 (11th Cir. 1992) (quoting Reider v. Thompson, 339 U.S. 113, 119 (1950)).

"A prima facie case is established under the Carmack Amendment upon proof by a preponderance of the evidence that (1) the goods were delivered to the carrier in good condition, (2) the goods arrived at the destination in damaged condition, and (3) a specified amount of damages resulted." A.I.G. Uruguay Compania de Seguros, S.A. v. AAA Cooper Transp., 334 F.3d 997, 1003 (11th Cir. 2003) (citing Fine Foliage of Fla., Inc. v. Bowman Transp., Inc., 901 F.2d 1034, 1037 (11th Cir.1990)); see Mo. Pac. R. Co. v. Elmore & Stahl, 377 U.S. 134, 138 (1964) (stating that "the shipper establishes his prima facie case when he shows delivery in good condition, arrival in damaged condition, and the amount of damages"). Once the shipper proves its prima facie case, "the burden shifts to the carrier to prove (1) that it was free from negligence, and (2) that the damage to the cargo was caused by one of the five excusable factors: '(a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods.'" A.I.G. Uruguay Compania de Seguros, 334 F.3d at 1003 (quoting Fine Foliage of Fla., Inc., 901 F.3d at 1039).

If the carrier cannot meet its burden, the Carmack Amendment imposes absolute liability on the carrier for "the actual loss or injury to the property" caused by the carrier.  49 U.S.C. § 14706(a)(1); see Werner Enters., Inc. v. Westwind Maritime Int'l, Inc., 554 F.3d 1319, 1326 (11th Cir. 2009) (citation omitted).  A carrier, however, prior to the shipment, may limit its liability "to a value established by written or electronic declaration of the shipper or by

written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation."  49 U.S.C. § 14706(c)(1)(A).  "[W]hether a carrier has effectively limited its liability" is determined by a four-part test:.

> [T]he carrier must: "(1) maintain a tariff with the prescribed guidelines of the Interstate Commerce Commission ["ICC"]; (2) obtain the shipper's agreement as to his choice of liability; (3) give the shipper a reasonable opportunity to choose between two or more levels of liability; and (4) issue a receipt or bill of lading prior to moving the shipment."

Sassy Dolls Creations, Inc. v. Watkins Motor Lines, Inc., 331 F.3d 834, 838-39 (11th Cir. 2003) (quoting Bio-Lab, Inc. v. Pony Express Courier Corp., 911 F.2d 1580, 1582 (11th Cir. 1990)).

The United States Court of Appeals for the Eleventh Circuit has recognized in dicta "that certain acts of Congress render the first requirement of Bio-Lab a legal impossibility." Siren, Inc. v. Estes Express Lines, 249 F.3d 1268, 1271 n.4 (11th Cir. 2001)  (explaining that the "Trucking Industry Regulatory Reform Act of 1994 eliminated the requirement that non-household goods carriers file a tariff with the ICC[,] . . . [a]nd the ICC Termination Act of 1995 eliminated the ICC itself . . ." (citations omitted)).  Similarly, other courts interpreting the four elements set out in Bio-Lab have simply ignored the first element, and continue to require carriers to prove the second through the fourth elements.  See Nipponkoa Ins. Co. v. Atlas Van Lines, Inc., 687 F.3d 780, 782 (7th Cir. 2012) (recognizing that "[f]ollowing the enactment of the Trucking Industry Regulatory Reform Act of 1994 and the ICC Termination Act of 1995, the first [element] . . . is no longer applicable"); Saacke N. Am., LLC v. Landstar Carrier Servs., Inc., No. 5:11CV107-RLV, 2012 WL 6590487, at *4 (W.D.N.C. Dec. 18, 2012)

(unpublished) (recognizing the same); <u>Allison-Erwin Co. v. Saturn Freight Sys., Inc.</u>, 106 F. Supp. 2d 1328, 1330 (N.D. Ga. 2000) (recognizing the same).

## IV.  Summary of the Parties' Positions

### A.  Plaintiffs' Motion for Summary Judgment

Plaintiffs request that judgment be entered in their favor in the amount of $560,000, plus interest from December 18, 2010 to the date of judgment, as well as costs of the action. Plaintiffs' Motion at 16.  Although Plaintiffs' Motion occasionally uses the word "Defendants," and although at the end of Plaintiffs' Motion they claim that both Defendants are liable, <u>see id.</u>, the entirety of Plaintiffs' substantive argument deals only with Barrett, <u>see id.</u> at 10-15. In fact, Plaintiffs even state, "Whether Landstar is also liable, and/or to what extent is a secondary issue."  <u>Id.</u> at 2.  Additionally, Plaintiffs' counsel conceded at the hearing that Plaintiffs did not move for summary judgment against Landstar.  The Court, then, considers Plaintiffs' request for entry of summary judgment to be against Barrett only.[10]

In their Motion, Plaintiffs first set out the legal requirements of a prima facie case under the Carmack Amendment, and then list the facts they believe show they have met those requirements.  <u>See id.</u> at 8-10.  Then, Plaintiffs argue that Barrett held itself out as a carrier and that Barrett for all intents and purposes was a carrier with respect to the subject shipment. <u>See id.</u> at 10-13.  According to Plaintiffs, Barrett is liable under the Carmack Amendment. <u>See id.</u>  Plaintiffs also contend that Barrett did not limit its liability and that there is no valid defense that would preclude Barrett's liability.  <u>See id.</u> at 13-15.  Plaintiffs conclude that they

---

[10]     Defendants, who are represented by the same counsel, also considered Plaintiffs' Motion to request entry of summary judgment against Barrett only.  <u>See</u> Barrett's Response at 1 n.1.

have met their burden of showing a prima facie case and Barrett has failed to set forth any limitation of liability or valid defense; therefore, Plaintiffs request entry of judgment against Barrett. <u>See</u> <u>id.</u> at 15-16.

In response, Barrett relies solely on one substantive argument: Barrett acted as a broker and not a carrier and that as a broker, Barrett is not subject to liability under the Carmack Amendment. <u>See</u> Barrett's Response at 8-13. Barrett then attacks the affidavit of Mr. Knight and the affidavit of Mr. Manetta, arguing that the affidavits contain expert opinions and/or hearsay, and the affidavits contradict deposition testimony and/or are internally inconsistent. <u>Id.</u> at 13-19. Barrett requests that those affidavits be stricken. <u>Id.</u>

In Plaintiffs' Reply, Plaintiffs again argue that Barrett acted as a carrier. Plaintiffs' Reply at 1-5. Then, Plaintiffs address Barrett's request to strike the two affidavits. <u>Id.</u> at 5-7. Plaintiffs contend that the affidavits do not contain expert testimony and that the affidavits are properly considered. <u>See</u> <u>id.</u>

### B. Barrett's Motion for Summary Judgment

Barrett's Motion is similar to its Response to Plaintiffs' Motion: Barrett asserts that it acted as a broker and cannot be held liable under the Carmack Amendment. <u>See</u> Barrett's Motion at 7-11. Alternatively, Barrett argues that its liability was limited by the Bill of Lading issued by Landstar. <u>Id.</u> at 12. Barrett asserts that if the Court finds Landstar acted as an agent of Barrett (the principal), then the Bill of Lading issued by Landstar would be equally applicable to Barrett. <u>Id.</u> Barrett also contends that Nationwide chose to obtain insurance through Essex rather than declaring a value to or requesting insurance through Barrett, which

according to Barrett, shows that Nationwide had a reasonable opportunity to choose between varying levels of liability. See id. at 12-14.

Plaintiffs responded to Barrett's contentions. See Plaintiffs' Response to Barrett's Motion. Plaintiffs claim that Barrett was a carrier, and "[t]here is absolutely nothing in the record to suggest that Barrett [or its agent, Landstar] fulfilled any of the criteria for limiting liability." Id. at 2, 16.

Barrett's Reply reiterates its arguments with respect to being a broker, and Barrett notes that "there were two shipments under two separate bills of lading carried by two separate entities which were transported from Illinois to Texas, [and] this case only involves one of those shipments," namely, the portion carried by Landstar. Barrett's Reply at 1-2. Barrett states that it "never made any affirmative representation that it would actually carry the magnet." Id. at 6. Barrett requests that its Motion be granted. Id.

C. Landstar's Motion for Summary Judgment

Landstar seeks partial summary judgment in its favor limiting its potential liability. See generally Landstar's Motion. In its Motion, Landstar argues that the Bill of Lading issued to Nationwide (through Mr. Depew) at the pick-up location and delivery location is sufficient to limit its potential liability to $1.00 per pound (or $14,000). See id. at 7-8. Specifically, Landstar contends that at the point of pick-up, it issued the Bill of Lading to Nationwide (through Mr. Depew), and Nationwide failed to declare a value of the shipment. Id. at 4-5. Therefore, according to Landstar, the standard liability language contained on the Bill of Lading applies, and Landstar's liability should be limited accordingly. Id. Landstar also

asserts that it "delivered the shipment to destination without issue, and the consignee received the shipment, executing the [B]ill of [L]ading, without exceptions." Id. at 3.

At the August 20, 2013 hearing, Landstar's counsel argued that Landstar's liability was also limited by the "Broker/Carrier Agreement" that Landstar executed with Barrett.[11]  See Doc. No. 24-1 at 6-15 (a copy of the Broker/Carrier Agreement).   Barrett and Landstar apparently entered into that agreement sometime in June or July 2010 (several months prior to the instant shipment).   Id. at 13.   The agreement appears to govern generally the relationship between Barrett and Landstar when Barrett acts as a broker and Landstar acts as a carrier. See id. at 6 (stating that Barrett "agree[s] to arrange for, and Landstar . . . agrees to provide, carrier transportation services for shipments of goods").   Regarding liability, the agreement states in pertinent part:

> [Landstar] shall be liable for loss or damage to goods being transported . . . in the amount as set forth in any order, billing or shipping documentation applicable to such shipment.  In the event that such liability terms are not set forth in that documentation for the shipment, [Landstar's] maximum liability for loss or damage to any one shipment shall be $100,000 . . . .

Id. at 8 ¶ 7.

In response, Plaintiffs contend that the Bill of Lading "serves only as a receipt under these circumstances," because "Landstar issued its [B]ill of [L]ading after the terms for the transport had already been fixed and agreed to between Nationwide and Barrett."  Plaintiffs' Response to Landstar's Motion at 2.  Even if the limitation of liability language on the Bill of

---

[11]     The agreement itself was entered into between "United Van Lines, LLC, Mayflower Transit, LLC and/or Insite Logistics, LLC dba UniGroup Worldwide UTS Logistics" and Landstar.  Doc. No. 24-1 at 6. According to Defendants' counsel at the hearing, Barrett is a subsidiary or affiliate of United Van Lines.  See also id. at 15; Doc. No. 24-2 at 2 ¶ 7 (affidavit of Randy Koepsell, President of Barrett, stating that Landstar and Barrett entered into the agreement prior to the transportation of the subject MRI); Doc. No. 26-3 at 4 ¶ 11 (affidavit of Mr. Manetta recognizing that Barrett is a "United Van Line company").

Lading applies, says Nationwide, the limitation is subject to "individually determined rates or contract that have been agreed upon in writing between the carrier and the shipper . . . ." Id. (emphasis omitted). Plaintiffs argue that Nationwide had a contract developed through emails (summarized above) with Barrett to transport the MRI and related equipment, and that the Bill of Lading cannot alter that contract. See id. at 2, 5. Plaintiffs conclude that Barrett and Landstar should both be considered carriers, and that Barrett and Landstar failed to limit their liability in any way. Id. at 2. Plaintiffs request Landstar's Motion be denied. Id. at 16.

### V. Summary Judgment Standard

Summary judgment is proper "when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1314 (11th Cir. 2011) (citing Fed. R. Civ. P. 56(c)). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). Although "all facts and reasonable inferences [must be viewed] in the light most favorable to the nonmoving party," Ramos-Barrientos v. Bland, 661 F.3d 587, 594 (11th Cir. 2011), "the nonmoving party cannot create a genuine issue of material fact through speculation, conjecture, or evidence that is 'merely colorable' or 'not significantly probative,'" Vega v. Invsco Grp., Ltd., 432 F. App'x 867, 869-70 (11th Cir. 2011) (quoting Anderson, 477 U.S. at 249-50). "When the only question a court must decide is a question of law, summary

judgment may be granted." <u>Saregama India Ltd. v. Mosley</u>, 635 F.3d 1284, 1290 (11th Cir. 2011).

"'Cross motions for summary judgment do not change the standard.'" <u>Perez-Santiago v. Volusia Cnty.</u>, No. 6:08-cv-1868-Orl-28KRS, 2010 WL 917872, at *2 (M.D. Fla. Mar. 11, 2010) (unpublished) (quoting <u>Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church</u>, 499 F.3d 32, 38 (1st Cir. 2007)). "'Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.'" <u>Id.</u> (internal quotation marks and citation omitted). When considering cross-motions for summary judgment, the Court must "consider and rule upon each party's motion separately and determine whether summary judgment is appropriate as to each under the Rule 56 standard." <u>Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins. Co.</u>, 176 F.3d 794, 797 (4th Cir. 1999) (citation omitted).

## VI.  Discussion

The undersigned addresses the motions in the following order: Barrett's Motion; Plaintiffs' Motion; and Landstar's Motion, resolving common issues among the motions as appropriate.

### A.  Barrett's Motion - Broker or Motor Carrier?

The threshold issue to resolve Barrett's Motion is whether Barrett acted as a broker or a carrier. As previously noted, a broker is "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. §

13102(2). "Generally, a broker is independent, serving as a middleman between motor carriers and the shipping public." Servicemaster Co. v. FTR Transp., Inc., 868 F. Supp. 90, 95 (E.D. Pa. 1994) (citing Reiter v. Cooper, 507 U.S. 258, 261 (1993)).  On the other hand, a "carrier" includes a "motor carrier," that is defined as "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14).  "The term 'transportation' includes a motor vehicle . . . or equipment of any kind related to the movement of passengers or property, or both, regardless of ownership or an agreement concerning use; and services related to that movement, including arranging for, receipt, delivery, . . . handling, packing, unpacking, and interchange of . . . property."  49 U.S.C. § 13102(23)(A)-(B) (formatting omitted).

"Whether a company is a broker or a carrier . . . is not determined by how it labels itself, but by how it holds itself out to the world and its relationship to the shipper." Saacke N. Am., LLC, 2013 WL 7121197, at *7 (citations omitted); Hewlett-Packard Co., 373 F. Supp. 2d at 1352 (citations omitted).  "The distinction between a broker and a carrier is often blurry. The key distinction is whether the party has 'accepted and legally bound themselves to transport' a shipment, in which case it is considered a carrier." Laing v. Cordi, No. 2:11-cv-566-FtM-29SPC, 2012 WL 2999700, at *2 (M.D. Fla. July 23, 2012) (unpublished) (quoting 49 C.F.R. § 371.2(a)); see Eastco Int'l Corp. v. Coyote Logistics, LLC, No. 09 CV 5400, 2009 WL 5125193, at *2 (N.D. Ill. Dec. 18, 2009) (unpublished) (stating that "[t]he Code of Federal Regulations further distinguishes carriers from brokers, and states that 'motor carriers . . . are not brokers within the meaning of this section when they arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have

accepted and legally bound themselves to transport'" (quoting 49 C.F.R. § 371.2(a))); see also

CGU Int'l Ins., PLC v. Keystone Lines Corp., No. C-02-3751 SC, 2004 WL 1047982, *2 (N.D.

Cal. May 5, 2004) (unpublished) (recognizing that "if [the defendant] accepted responsibility

for ensuring delivery of the goods, regardless of who actually transported them, then [the

defendant] qualifies as a carrier.  If however [the defendant] merely agreed to locate and hire

a third party to transport the machines, then it was acting as a broker").

Here, as a matter of law, Barrett acted as a motor carrier with respect to the subject

shipment.  First, Barrett's actions fall squarely within the statutory definition of a motor carrier.

Barrett provided "transportation for compensation," in that Barrett provided "services related

to th[e] movement of" and "arrang[ed] for" the delivery of Nationwide's property, and Barrett

sought compensation from Nationwide for doing so.  49 U.S.C. § 13102(14), (23)(A)-(B); AIOI

Ins. Co. v. Timely Integrated, Inc., No. 08 Civ. 1479(TPG), 2009 WL 2474072, at *3 (S.D.N.Y.

Aug. 12, 2009) (unpublished).  The fact that Barrett itself did not actually transport the portion

of the shipment that was damaged is of no consequence in light of the Carmack Amendment's

broad definition of "transportation."  See Rush Indus., Inc. v. MWP Contractors, LLC, 539 F.

App'x 91, 94 (4th Cir. 2013) (recognizing the Carmack Amendment's broad definition of

"transportation" and that the Carmack Amendment "applies to a company . . . that is in

contract with a shipper to handle the movement of property and subcontracts the actual

physical shipping of the property in question"); see AIOI Ins. Co., 2009 W 2474072, at *2-4;

Land O'Lakes, Inc. v. Superior Serv. Transp. of Wis., Inc., 500 F. Supp. 2d 1150, 1155 (E.D.

Wis. 2007) (indicating that "[l]iability under the Carmack Amendment . . . extends beyond the

carrier who actually provides the transportation.   It extends to any carrier providing transportation or service") (quotations and citation omitted)).

Second, the exchange of emails between representatives of Nationwide and Barrett reflect that Nationwide authorized Barrett to transport the MRI and related equipment, and Barrett accepted and legally bound itself to do so.  In this respect, Barrett, therefore, acted as a motor carrier, not as a broker.  See Mach Mold Inc. v. Clover Assocs., 383 F. Supp. 2d 1015, 1029-30 (N.D. Ill. 2005) (defining a carrier as one who is "'authorized to transport'" property and "'ha[s] accepted and legally bound [itself] to transport'" (quoting 49 C.F.R. § 371.2(a)).  Simply because Barrett contracted with Landstar to assist with the transportation does not render Barrett a broker and relieve it of liability.  See id.; see also KLS Air Express, Inc. v. Cheetah Transp. LLC, No. CIV. S-05-2593 FCD DAD, 2007 WL 2428294, at *4 (E.D. Cal. Aug. 23, 2007) (unpublished) (stating that "a carrier is not automatically considered a broker because it requests another carrier to perform the transportation").  This is especially true when considering Barrett's truck and driver actually carried half of the shipment, and that Barrett essentially worked in tandem with Landstar to complete the entire shipment.

Regarding when Nationwide knew about Landstar's involvement with the shipment, Barrett asserts that its reference to reaching out to its "logistics dept" to search for a team of drivers should have clued Nationwide into the fact that Barrett would not actually carry that portion of the shipment.  See Doc. No. 31-2 at 23 (deposition of Ms. Jacobson in which she refers to the emails between Nationwide and Barrett representatives regarding scheduling the subject shipment, indicating she mentioned Barrett's "logistics division to find a flatbed driver or team").  A reasonable person in Nationwide's shoes could not have been expected to know

from Barrett's mere reference to its "logistics dept" that Barrett was attempting to act as a broker on one part of the shipment and as a carrier on the other part of the shipment. Barrett never told Nationwide that it would not actually carry the entire shipment or that it was looking for a third party to carry part of the shipment. In fact, Barrett provided a contact name and number of a Barrett employee in case of an emergency during the shipment (because the shipment occurred over a weekend)–providing additional evidence that Barrett was accepting responsibility for and legally binding itself to transport the shipment.

Third, it appears that two (2) invoices were issued to Nationwide for the subject shipment (albeit the invoices are dated after the shipment was complete). See Doc. No. 41-1 at 3-4.[12] The first invoice is from United Van Lines, LLC and dated December 28, 2010 (Doc. No. 41-1 at 4), and the second invoice is from Barrett and dated January 4, 2011 (Doc. No. 41-1 at 3). Neither invoice mentions Landstar or suggests that Barrett acted as a broker. See Doc. No. 41-1 at 3, 4. In fact, the description on the Barrett invoice dated January 4, 2011 is "transportation cost flatbed with tarp service avanto magnet." Doc. No. 41-1 at 3 (capitalization and formatting omitted). The magnet transported on the flatbed truck was the part allegedly damaged in transport. Barrett invoiced Nationwide for that portion of the shipment without any mention of Landstar, a brokerage fee, or any other indication that would suggest Barrett did not act as a carrier with respect to that portion of the shipment. See Contessa Premium Foods, Inc. v. CST Lines, Inc., No. CV 10-7426 (FFMx), 2011 WL 3648388, at *4 (C.D. Cal. Aug. 18, 2011) (unpublished) (in finding the defendant to be a carrier rather than a broker, the court noted that "the [d]efendant invoiced [the p]laintiff . . .

---

[12]    Duplicate of Barrett invoice found at Doc. No. 1 at 9.

directly for carrier services, which 'create[s] an inference that [the defendant] held itself out to [the p]laintiff as a transporter of property'") (quoting <u>Delta Research Corp. v. EMS, Inc.</u>, No. 04-60046, 2005 WL 2090890, at *6 (E.D. Mich. Aug. 29, 2005) (unpublished)).

Fourth, Barrett held itself out to the world as being a motor carrier of specialized medical equipment.[13]  <u>See Saacke N. Am., LLC</u>, 2013 WL 7121197, at *7 (recognizing that "[w]hether a company is a broker or a carrier . . . is not determined by how it labels itself, but by how it holds itself out to the world and its relationship to the shipper" (citations omitted)). It is undisputed that Barrett has the operating authority and is licensed to do business as a motor carrier and as a broker.  <u>See</u> Doc. No. 20-2 at 1 (Barrett's responses to Plaintiffs' Request for Admissions, indicating Barrett's "authorities include broker, motor carrier, and household goods motor carrier").  One of the pages on Barrett's public website refers to "Shipping Medical Equipment."  <u>See</u> Doc. No. 20-1 at 6; <u>see</u> Doc. No. 20-2 at 2 (Barrett admitted that its website "speaks for itself").  On that same web page, Barrett states it has "a vast and varied fleet that can handle the most sensitive and specialized medical equipment." Doc. No. 20-1 at 6.  Barrett also discusses its fleet, including the number of tractors and trailers it owns and has access to.  <u>See id.</u>  The information contained on this web page would lead a reasonable person to believe that Barrett itself provides the transportation of specialized medical equipment.  While this point is not as determinative as the others, it is one

---

[13]     At the hearing, Defendants' counsel argued that the case law considering whether a party acted as a broker or a motor carrier when the party has the authority to act as either considers only how the party held itself out to the shipper in the particular shipment, not how the party held itself out to the world. Here, the undersigned finds that to the world, and to Nationwide in this particular shipment, Barrett held itself out as a motor carrier.

taken into consideration on the whole, and one that supports the finding that Barrett was a motor carrier for the subject shipment.

For the reasons listed above, Barrett's actions render it a motor carrier.  As a carrier, Barrett is subject to liability pursuant to the Carmack Amendment.

Regarding Barrett's alternative argument that its liability is limited based on the Bill of Lading issued by Landstar, as explained fully below in the section addressing Landstar's Motion, the Bill of Lading in this instance served merely as a receipt.  Therefore, Barrett's liability cannot be limited on that basis.

In light of the above, Barrett's Motion is due to be denied.  The Court now proceeds with a discussion of Plaintiffs' Motion and Landstar's Motion.

B.  Plaintiffs' Motion

To resolve Plaintiffs' Motion, the undersigned must first determine whether Plaintiffs have stated a prima facie case.  As noted above, Plaintiffs must prove three elements to establish liability under the Carmack Amendment: "(1) the goods were delivered to the carrier in good condition, (2) the goods arrived at the destination in damaged condition, and (3) a specified amount of damages resulted."  A.I.G. Uruguay Compania de Seguros, S.A., 334 F.3d at 1003 (citation omitted).

Upon review of the entire file and consideration of the undisputed facts in the record, the undersigned finds that Plaintiffs have proven the three elements necessary to state a prima facie case under the Carmack Amendment.  First, Nationwide has shown that prior to loading the magnet onto the flatbed truck, the magnet was in good condition.  See Doc. No. 21-2 at 17 (Mr. Manetta indicating that "the magnet was tested prior to being removed,

everything was fine . . ."); Doc. No. 26-1 at 2 ¶¶ 1, 5 (affidavit of Rex Conley, Subrogation Supervisor at Essex, indicating that the magnet was in good condition prior to shipment); Doc. No. 26-2 at 5 ¶ 3, 7 ¶¶ 9-10 (affidavit of Mr. Knight indicating the MRI was in "excellent condition" prior to shipment), 14 (post-loss report of Technical Restoration Services, Inc. recognizing that "prior to the removal," the magnet "was clearly operating per manufacturer specifications"), 20 (comments from a site inspection report completed by Clearview Equipment Services dated November 16, 2010 showing the MRI was in "excellent condition" before the transportation).[14]  Second, the magnet then arrived at destination in damaged condition.[15]  See Doc. No. 21-1 at 17-18, 79-80 (portions of Mr. Manetta's deposition); Doc. No. 31-7 (post-loss report from The Recovery Services Group, Inc. directed to Landstar's Claims Department); Doc. No. 26-1 at 2 ¶ 5 (affidavit of Mr. Conley indicating that Essex had the magnet's condition tested "before agreeing that [it] was a total loss"); Doc. No. 26-2 at 7 ¶ 10, 7 ¶ 14, 10 (affidavit of Mr. Knight including photograph of ice buildup on the magnet at the point of destination in Texas), 12-14 (post-loss report from Technical Restoration Services, Inc.), 16-17 (post-loss field service report from Oxford Instruments), 27-34 (post-loss inspection report completed by Mr. Knight).  Third, Plaintiffs have suffered damages as a result.  See, e.g., Doc. No. 26-1 at 1 ¶ 2, 2 ¶¶ 6-7 (affidavit of Mr. Conley reflecting that Nationwide purchased the MRI for $420,000; Essex paid Nationwide $346,500 under the

---

[14]    Duplicate copy of report found at Doc. No. 26-3 at 20-28.

[15]    "[A] clean delivery receipt merely establishes a presumption of good condition and is subject to rebuttal by evidence of damage."  Great Am. Ins. Co. v. USF Holland, Inc., 937 F. Supp. 2d 376, 386 (S.D.N.Y. 2013) (citation omitted); cf. Terman Foods, Inc. v. Omega Lines, 707 F.2d 1225, 1227 (11th Cir. 1983) (recognizing that "[a] clean bill of lading is prima facie evidence that the carrier received the goods it describes").  To the extent Barrett challenges the fact that the shipment arrived in damaged condition because no exceptions were noted on the Bill of Lading, the undersigned finds as a matter of a law that any presumption of good condition based on the clean Bill of Lading has been overcome.

insurance policy; and Nationwide "bore the remaining damages [totaling $213,500, that] is the difference between what [Essex] paid and the amount that the unit was sold for, which was $560,000"), 6 (a copy of the check from Essex to Nationwide in the amount of $346,500); Doc. No. 26-3 at 1-2, ¶ 2 (affidavit of Mr. Manetta reflecting that Nationwide purchased the MRI for $420,000 and sold it to Prime Imaging prior to the shipment for $560,000), 8 (receipt from Siemens Financial Services reflecting Nationwide's purchase price of $420,000), 10-17 (purchase agreement between Nationwide and Prime Imaging Partners, showing Prime Imaging Partners purchased the MRI from Nationwide for $560,000). Plaintiffs have proffered sufficient evidence to meet their prima facie case.

Addressing Barrett's specific arguments with respect to the evidence presented by Plaintiff, the undersigned notes that Barrett does not present any facts disputing Plaintiffs' prima facie case. Rather, Barrett attacks the evidence offered by Plaintiffs on this issue. In its response to Plaintiffs' Motion, Barrett seeks to strike "all portions of the Larry Knight affidavit which purport to offer expert testimony" and "multiple paragraphs of the affidavit of Robert Manetta." Barrett's Response at 14, 16. As to the affidavit of Mr. Knight, Barrett argues that Plaintiffs never disclosed Mr. Knight as an expert, and they cannot do so now after the close of discovery. Id. at 13-14. Barrett further argues that certain paragraphs of the affidavit are contradicted by the deposition testimony of Mr. Manetta, Plaintiffs' designated corporate representative. Id. at 15. As to Mr. Manetta's affidavit, Barrett argues that it includes hearsay and expert testimony. Id. at 16-19.

Including a request for relief from the Court in a response to a motion is inappropriate. See Local Rule 3.01(a), United States District Court, Middle District of Florida (requiring that

requests for relief be in the form of a motion); see also Pine v. Bd. of Cnty. Comm'r of Brevard Cnty., No. 6:06-cv-1551-Orl-19JGG, 2007 WL 865593, at *1 (M.D. Fla. Mar. 21, 2007) (unpublished).  For that reason alone, Barrett's request to strike portions of Mr. Knight's and Mr. Manetta's affidavits is due to be denied.

Regardless, the undersigned finds that even excluding the controversial paragraphs identified in the affidavits, the other undisputed affidavits and exhibits in the record (as noted above) are sufficient to establish as a matter of law the elements of Plaintiffs' claim.[16]  The undersigned must now determine whether Barrett[17] has met its burden of showing it was free from negligence and that the damage was caused by one of the five excusable factors.  See A.I.G. Uruguay Compania de Seguros, 334 F.3d at 1003 (citation omitted).

Upon review of the entire record, the undersigned finds Barrett has failed to meet its burden.  Barrett's Response to Plaintiffs' Motion is based entirely on its theory that it acted as a broker.  Barrett has not set forth any evidence to show that it was free from negligence or that the damage was caused by one of the five excusable factors, see id., and Barrett cannot simply rely on its affirmative defenses raised in its Answer (Doc. No. 7; "Barrett's Answer") to

---

[16]    Even considering Barrett's requests, the Court notes the inherent conflict in one of Barrett's arguments.  Barrett asks the Court to strike Mr. Knight's statement that he observed the unit being de-installed and loaded on the flatbed truck based on Mr. Manetta's deposition testimony that Mr. Knight left the pick-up location after the de-install was complete.  Then, Barrett seeks to strike Mr. Manetta's affidavit based on hearsay, because Mr. Manetta was not present when the unit was picked up.

[17]    As noted above, Plaintiffs did not move for summary judgment against Landstar.

refute summary judgment,[18] see Qantum Commc'ns Corp. v. Star Broad., Inc., 473 F. Supp. 2d 1249, 1260 (S.D. Fla. 2007).  Accordingly, judgment is due to be entered against Barrett.[19]

### C.  Landstar's Motion

As noted above, Landstar seeks to limit its liability based on the language contained in the Bill of Lading.  In its simplest terms, the following is a summary of what happened. Nationwide and Barrett had an established course of dealing.  When Nationwide needed to transport an item, Nationwide would email Barrett.  Nationwide and Barrett would exchange emails, an agreement would be reached, and the item would be transported.  Barrett would seek payment from Nationwide, and Nationwide would pay Barrett.

Consistent with that course of dealing, Nationwide emailed Barrett for a quote to transport the subject MRI.  Barrett provided a quote and an agreement was made.  The

---

[18]    "An affirmative defense is an assertion raising new facts and arguments that, if proven, defeat the plaintiff's claim even if the allegations in [the] complaint are true." Wells Fargo Bank, N.A. v. Trotman, 940 F. Supp. 2d 1359, 1368 n.8 (M.D. Ala. 2013) (quotation and citation omitted) (emphasis added).  "[O]n a plaintiff's motion for summary judgment, the defendant bears the initial burden of showing that the affirmative defense is applicable . . . and it is [o]nly upon such a showing [that] the burden shift[s] to [a] plaintiff regarding that affirmative defense."  Id. (quotations and citations omitted).
    Barrett's affirmative defenses as stated in its Answer largely consist of general, boilerplate language. For example, the seventh affirmative defense states, "If the shipment referred to in the complaint suffered any loss or damage or delay, such loss, or damage or delay was caused by acts or omissions of a party or parties over whom Barrett had no control."  Barrett's Answer at 5.
    Likewise, at the hearing, Barrett's counsel stated that Barrett disputes the cause of Plaintiffs' loss and the amount of damages.  In its papers, however, Barrett does not present any evidence to the rebut Plaintiffs' evidence or any evidence that the magnet was damaged by one of the five excusable factors.  Barrett also provides no evidence to rebut the amount of damages claimed by Plaintiffs.  Barrett's boilerplate affirmative defenses are of no assistance to it on summary judgment because it has failed to otherwise support those defenses.

[19]    As explained below, there are several issues that remain to be resolved; one of those issues involves the potential of joint and several liability between Defendants.  Accordingly, the judgment against Barrett will not enter until the entire case is resolved.  See generally Frow v. De La Vega, 82 U.S. 552 (1872) (albeit in the context of a default judgment, recognizing that when a plaintiff alleges two defendants are jointly and severally liable, a court should not enter a default judgment against one defendant until the liability of the non-defaulting defendant is determined); Gulf Coast Fans, Inc. v. Midwest Elecs. Imps., Inc., 740 F.2d 1499, 1512 (11th Cir. 1984).

general elements of a contract (offer, acceptance, consideration) and all necessary and material terms (price, location, date and time, etc.) were present in the emails. Despite Defendants' counsel's argument at the hearing that the emails were not a contract for transportation of the subject MRI, the undersigned finds as a matter of law that the emails were a contract.

Barrett hired Landstar to assist Barrett; Barrett and Landstar had an entirely separate agreement (the Broker/Carrier Agreement).[20]  At the point of pick-up, the Landstar drivers provided the Bill of Lading to Mr. Depew to sign to indicate that the shipment was being picked up.  Barrett and Landstar transported the subject shipment.  The magnet was damaged. Nationwide advised Barrett, and Barrett attempted to shift the blame to Landstar.

The deal consummated by emails between Barrett and Nationwide is the contract that governed the subject shipment.  This contract was consistent with the parties' prior dealings. Nationwide did not ask for insurance or declare a value, and Barrett provided a flat rate.  The Landstar Bill of Lading signifies pick up and delivery and acts as nothing more than a receipt. Nationwide and Landstar were not in privity; the deal governing the transport was made between Nationwide and Barrett.  Landstar's Bill of Lading does not modify the contract previously entered into between Nationwide and Barrett.  See generally Estes Express Lines, Inc. v. Macy's Corporate Servs., No. 08-cv-3582 (PGS), 2010 WL 398749, at *6-7 (D.N.J. Jan. 28, 2010) (unpublished) (in a breach of contract case, recognizing that "[w]hen a separate

---

[20]    The Broker/Carrier Agreement between Barrett and Landstar appears to be a general agreement that governs the relationship between Barrett and Landstar.  Regardless of how Barrett and Landstar agreed to characterize their relationship, the Broker/Carrier Agreement has no effect on the agreement reached between Nationwide and Barrett for the shipment at issue.  It also has no effect on the finding that Barrett, in this instance, acted as a motor carrier.

contract is executed, the bill of lading 'serves only as a receipt for the transfer of the goods, and will not serve to alter the terms of the previous agreement'") (quoting <u>Vanlab Corp. v. Blossom Valley Foods Corp.</u>, No. 04-cv-6183, 2005 WL 43772, at *3 (W.D.N.Y. Jan. 10, 2005) (unpublished)).  Any relief due to Landstar is from Barrett.  Accordingly, Landstar's Motion is due to be denied.

## VII.  Conclusion

Because Barrett was a motor carrier with respect to the instant shipment, Barrett is subject to liability under the Carmack Amendment.  Plaintiffs set forth sufficient evidence to prove their prima facie case, and Barrett failed to submit any evidence to dispute that. Barrett's Motion, which relies entirely on Barrett's theory that it was a broker, is due to be denied, and Plaintiffs' Motion is due to be granted to the extent that Barrett, as a carrier, is liable for the loss suffered by Plaintiffs.  As to Landstar, on these facts, the Bill of Lading was as a receipt and cannot serve as a limitation on Landstar's (or Barrett's) potential liability. Landstar's Motion is due to be denied.

With all this resolved, the following issues remain.  First, in light of the findings in this Order, whether Plaintiffs have a viable cause of action under the Carmack Amendment against Landstar.  Second, if a viable cause exists, whether Landstar is liable for Plaintiffs' damages.  Third, if Landstar is liable, whether Defendants are jointly and severally liable.[21]

---

[21]     At least three Circuits have recognized the potential of joint and several liability in the context of a Carmack Amendment claim.  <u>See</u> <u>Rankin v. Allstate Ins. Co.</u>, 336 F.3d 8, 17 (1st Cir. 2003); <u>Jessica Howard Ltd. v. Norfolk S. Ry.</u>, 316 F.3d 165, 169 (2d Cir. 2003); <u>Pizzo v. Bekin Van Lines Co.</u>, 258 F.3d 629, 634 (7th Cir. 2001).

Fourth, regardless of the three other issues, Plaintiffs' request for prejudgment interest must be resolved.[22]

After due consideration, it is

**ORDERED**:

1.      Defendant Landstar Transportation Logistics, Inc.'s Motion for Partial Summary Judgment to Limit Liability (Doc. No. 22) is **DENIED**.

2.      Defendant Barrett Moving & Storage, Inc.'s, Motion for Summary Judgment (Doc. No. 23) is **DENIED**.

3.      Plaintiffs' Motion for Summary Judgment (Doc. No. 27) is **GRANTED in part and DENIED without prejudice in part**.  The Motion is **GRANTED to the extent** that judgment will enter for Plaintiffs and against Barrett Moving & Storage, Inc. after the remaining issues in this matter are resolved.  The Motion is **DENIED without prejudice** to seeking costs at the conclusion of the case.

---

[22]      The Eleventh Circuit has found no error in a district court's award of prejudgment interest in a Carmack Amendment case.  See Werner, 554 F.3d at 1328-29; see also Hiram Walker & Sons, Inc. v. Kirk Line, 877 F.2d 1508, 1517 n.11 (11th Cir. 1989) (recommending that a district court on remand "consider the applicability of the reasoning in George R. Hall, Inc. v. Superior Trucking Co., 532 F. Supp. 985, 996-98 (N.D. Ga. 1982)" when deciding a claim for prejudgment interest under the Carmack Amendment).  The George R. Hall, Inc. court found it "clear that an award of prejudgment interest may be allowed in the discretion of the trial judge as part of the compensation granted to make whole the injured party in Carmack Amendment cases."  532 F. Supp. at 996.  Unless Defendants provide convincing case law to the contrary, the Court is likely to award prejudgment interest in this case as requested by Plaintiffs.  The specific issue that must be resolved is when the calculation begins (date of delivery, date of filing claim, date of filing case) and when it ends (the date of this order or the date judgment is eventually entered).

4.      A separate notice will enter setting a telephonic status hearing to discuss the remaining issues as outlined above and to schedule the trial.  Should the parties believe other issues remain to be resolved, they shall so advise the Court at the status hearing.

**DONE AND ORDERED** in Jacksonville, Florida on March 31, 2014.

_James R. Klindt_
**JAMES R. KLINDT**
United States Magistrate Judge

jlk
Copies to:
Counsel of Record